Good morning, Your Honors. Michael Morgas for Appellant Glenn Anderson. A phrase that came up in one of the cases earlier today kind of stuck with me for the past hour. Conspicuously naive. This case stalled at the stage where the district court found that we had to be naive about Chief DeAnders' reasons for terminating Officer Anderson and that we couldn't really look at the evidence to see whether there was pretext or whether he would have taken the same level of discipline against Chief DeAnders. In light of the findings and the evidence in the investigations. And that's not the test. Under the Mount Healthy But-For test, the defendant has the burden to show that there's conclusive evidence that the unprotected behavior was the but-for cause of the action. Stated another way, the defendant had to show that there was only one reasonable conclusion that the department would have terminated Officer Anderson. And there really is plenty of reason to doubt DeAnders' explanation and Ed Scott's as well. And I'd like to amplify some of that evidence. For instance, I'd like to start with the deposition of DeAnders, which is in the record. And I'm talking about pages 221, 222. He was asked, was Ed Scott upset when he visited you after there was this discussion with Freeman and the text messages? DeAnders said no. Did Ed Scott say to you that what DeAnders did was inappropriate? He said no. Did he say anything to you about this was not the first time Glenn Anderson was involved in politics? DeAnders said no. He was asked, did Ed Scott say that what he did was inappropriate and he should be held accountable? And DeAnders said no. But when you look at this April 7, 2016 memorandum at pages 1209 and 1210 in the record, it's as plain as day. He says, Counselman Scott was very upset. He said it was not appropriate for an officer to be involved in politics. He told me this was not the first time Glenn Anderson has involved himself in politics. His actions were inappropriate and he should be held accountable for his actions. If we were to hold DeAnders to half of the standard that he claimed to hold Officer Anderson to, DeAnders himself would say we should not believe DeAnders. It's this combination of downplaying the significance of this speech and playing up the evidence to support the disciplinary findings. Ed Scott said when he was asked about disclosing the text messages to DeAnders, he said I was merely reporting to DeAnders that I had received the text messages and I was concerned. And I also talked to the mayor and she didn't tell me anything about what she would do. And that's at page 387 of the record. But that completely contradicts what DeAnders' memo says about that conversation, including that Ed Scott told him I talked to the mayor and she said she's going to be contacting you to file a personnel complaint. So once again, they're downplaying the significance of the speech and that is reason enough, I think, to send this to a jury to question whether the reasons given for the termination deserve any credence. And of course this also ties in with whether this was an inquiry or an investigation. Why that matters in this case is beyond me. It doesn't matter to us, shouldn't matter to us, whether, forget your theory, the conduct itself could justify discharge. Well, that may be, but that's not the standard on summary judgment. There's evidence to suggest that with how well-known this was, with the evaluations, with the commendations, with Lieutenant Krakowski passing this information to the chief and getting approval, Lieutenant Carroll or Captain Carroll, with how open and public it was, with the investigation saying all he may have done was been overzealous. There's a real question of, and she really didn't gain any personal benefit from this, there's a real question of whether they would have said, hey, you know, Glenn, what you're doing is great, but why don't you kind of take a step back, let's do this step-by-step and let's do it the right way, you know, if we need to get permits or whatever it is. There's a real question, and that becomes apparent when you look at... I mean, I'm not sure legally... No. Well, one investigation had started beforehand. Two of them had started beforehand, isn't that right? And you're saying that's the only one that happened before the speech came to the attention of the chief? to conduct an investigation into the speech is the same day the next investigation started, the big one, 2016-008, into the K-9 yard. And there's this particular finding that gives me pause. No. Disciplinary actions. A long run of disciplinary actions, he had a long run of commendations, he had a long run of... He had a significant number of disciplinary actions brought against him leading up to his termination. During that year, yes. And the violation was that he violated a lot of rules, correct? No, but he was successful in clearing himself on how many of them, was it one? I'm not sure that he was able to clear himself of any of those. But they wouldn't allow him to. Oh, right. The day after he was cleared on that, they removed his dog and reassigned him to patrol. That gives one pause to think he was taking it out another way, and this K-9 investigation was the perfect cover. We'll remove his dog. They didn't finish that investigation until three or four months later, and they only gave him one day off, and then they removed him from the K-9 unit, even though in that investigation, they said he was dishonest. But if you read the declaration of DeAnda, he says, because I found dishonesty, I had no choice to terminate. So he makes this about dishonesty, not about building permits. Even the district court said he may have had approval from the department for these projects, but he didn't have approval or permits, meaning from the building department. The one that does it in that investigation, there's two things. He says that forensics confirmed, DeAnda says, that forensics confirmed that you forged the chief's initials on this memorandum approving these projects, as if to say you never had approval. It is without question he had approval for these projects. He received a public award from the chief who gave him the approval, Chief Farrar, the previous chief, for this work that was approved. But when you look at the investigation, the forensics did not confirm that the signature was fraudulent. All the report says is may not have been the initials of the person whose initials they're purported to be. So what did DeAnda do? He said, I'm concluding that you forged his initials. He has no basis to conclude that, but that's the type of thing that leads one to say, well, he was dishonest, I have to fire him. But the evidence to support that finding is questionable. That's something that needs to go to the jury. Do we believe that DeAnda believed that he forged those initials? He has no basis to say it. He even misquoted the report, made it look like the report confirmed that it was signed by somebody else on the report. The best that they can come up with is a forensic specialist. They went to a forensic specialist for this. It was that maybe it was the initials were by somebody else. We don't have to believe DeAnda's reasons. And if we don't believe DeAnda's reasons, we don't have to conclude that he would have fired him, but for, you know, absent of speech. That's what this case is about. The next one, this issue with Captain Wilson, this is Investigation 2016-024. The chief said, you told Captain Wilson that you were not able to work any of your outside jobs when you actually worked some of your outside jobs. Therefore, you were dishonest to Captain Wilson. This is when he's on administrative leave. He's assigned to home. He has a different schedule. It affects what outside jobs he can work. This is at page 1199 of the record. So he said you were dishonest to Wilson about not being able to work any versus some of the jobs. But Wilson's interview in Internal Affairs, not his deposition, once the case starts, his interview in Internal Affairs says, I was under the impression that he was unable to work some of his jobs that he was accustomed to. And Anderson, who was also interviewed, said, I may have said I can't work all of my off-duty jobs or outside jobs. Yet the chief makes a finding that he said that he couldn't work any of his outside jobs, and that was dishonest because he was able to work one or two of them. So there's no evidence to support this finding. And even more grotesque, I suppose, is that the chief issued the recommendation on that investigation of termination and then concurred in his own recommendation. This didn't come from somebody else. This was the chief. This was the chief coming up with reasons to fire this person that were not credible. And if that's a question, then it has to go to the jury. The same thing with the Facebook posts, which is investigation 2016-024, I think. They said he engaged in harassment of other officers. They were exchanging Facebook messages that were inappropriate on one particular officer's page. But when they interviewed this officer, he said, I wasn't offended. The other officer wasn't offended. They made comments about Anderson. Anderson made comments about them. Nobody was offended. Do you want to reserve your remaining time? Yes, I will just make one final point on that. Yet they found that he engaged in harassment of these people when they made no such claim. This is evidence of trying to fluff up this case. Good morning, Your Honors. May it please the Court, Mark Meyerhoff on behalf of the City of Rialto. I want to fill in some gaps and also to correct some statements that were made. But first, this Court should affirm the District Court's order dismissing this case on summary judgment. The District Court properly determined that the City of Rialto lawfully terminated Glenn Anderson after several internal affairs investigations concluded that he violated more than two dozen city and department policies, such as giving false information, misrepresenting material information, and publicly accessible materials on Facebook. This case can really be synthesized down into two main categories. One is the speech. And my opponent spends a lot of time trying to attack the investigations and point out subtle inconsistencies in testimony with the investigations. But what he doesn't do, and what he must do under the Ninth Circuit authority, is tie Mr. Anderson's termination to the speech. And as we know from Ninth Circuit authority, you can't show a retaliatory motive through pure speculation. And that's basically what we are hearing, is pure speculation. The speech itself is important. The speech consists of an extremely brief conversation between Mr. Anderson and a political consultant in the City of Rialto, in which Mr. Anderson very briefly echoed and parroted something he heard on a video of a City Council meeting a couple of months before. That political consultant then, mistakenly and erroneously and accidentally, sends that to Council Member Scott. And the content of what Mr. Anderson saw on this video of the City Council meeting was basically an accusation that happened in an open meeting, before the public, that the mayor had misappropriated funds in some way. And that's what Mr. Anderson tells this political consultant. The political consultant accidentally tells Council Member Scott about this conversation. And Council Member Scott goes to the police chief and says, can you look into this? I don't like the idea of an officer knowing about potentially a confidential investigation, which didn't exist. And then the mayor also contacted the chief and said, can you look into this? What's important and what you fail to hear is that the chief did order an inquiry into this. And the import of inquiry is that it's not an investigation. It's a preliminary interview of witnesses to see if there needs to be an investigation. If the chief had retaliatory animus, he could have ordered a full-blown investigation and terminated Mr. Anderson for that speech. And he didn't do it. He ordered an inquiry. The inquiry took five and a half hours, and it came back that Mr. Anderson did nothing wrong. And the chief accepted that, and that was the end of that group of facts. Council Member Scott makes no further appearance in this case. Mayor Robertson makes no further appearance in this case. They had nothing to do with the pattern and line of investigations that was to then come. And that's the second category of events, the category of events that does meet the fifth prong of the aim tasked to show that Mr. Anderson would have been terminated regardless of this extremely short conversation he had with Mr. Freeman. And that category of events goes something like this. He was investigated for bringing a K-9 to on patrol who was not certified and who had not been trained. And that investigation was initiated before the speech. He was then investigated for inappropriate, unpermitted, unauthorized structures on the K-9 yard. That investigation was initiated by the city administrator finding these structures accidentally when he was touring the neighboring park and saw a trench in the park. The city administrator knew nothing of Mr. Anderson's speech, and he reported to the department saying, hey, I see a trench going into the yard. Do you know anything about it? And that initiated that investigation, which was, by the way, investigated by internal affairs, not Chief DeAnda, and an independent investigator, both of whom concluded that there were several and significant violations of city rule and city policy. From that investigation, the city then found that Mr. Anderson also had been contacted by the county for a shortage in marijuana, in these marijuana kits that he has for K-9 training. They found that out by looking at his e-mails, investigating the K-9 yard. So that had an independent basis that had nothing to do with Chief DeAnda finding these facts or initiating them. That also then led to a finding of all this unauthorized dog food and the other investigations, including the last investigation, which found that Mr. Anderson had posted inappropriate and offensive and homophobic, graphically homophobic, pictures and comments on publicly accessible Facebook pages. So are you saying that the investigations after the speech started with this county investigation and then cascaded into each of the other investigations? Absolutely, and that's exactly what the district court found. The K-9 yard was the first investigation after the speech, and that was initiated by the city administrator independently finding this trench and reporting that, and that led to that investigation, and that investigation led to the discovery of all these other investigations. What my opponent tries to do is to leap the gap between this speech and these other investigations but he can't do it. There is just simply no evidence, and there's nothing in the record at all, that makes that leap. Councilmember Scott has testified that he had nothing to do with any of these other investigations. There's no evidence contradicting that. Mayor Robertson, the same. Chief DeAnda, the same. The argument, as you have read the briefs, is that the K-9 yard was the first investigation. Anderson himself acknowledges that the investigations had some merit, that there was a good reason to initiate these investigations. From their opening brief, they themselves say that, yeah, there were unauthorized and unpermitted structures on the K-9 yard. That, yeah, it was concerning that Mr. Anderson had lost a large quantity of marijuana. And, yeah, he didn't have authorization to get this dog food, but what they want the Ninth Circuit to do is to question the severity of the discipline and say that, well, but Chief DeAnda would have given him a lesser form of discipline except for this speech, that the speech caused Chief DeAnda to somehow reach the decision to terminate Mr. Anderson. But there's absolutely no evidence in the record to support that speculation, nor are there any facts or evidence to suggest that other employees have engaged in similar misconduct and have received a lesser form of discipline, which also may have been somewhat relevant in arguing that there was some retaliatory animus here. But there's no evidence of that either. So at the end of the day, we have the speech, which was looked into, concluded, wrapped up, and put away, determining that that speech that he engaged in did not violate any policy at all, and the characters involved in that speech had no further appearance in these facts. And then we have this cascading investigation that led to other investigations and ultimately led to Mr. Anderson's necessary termination. There was also a statement made about this forging of the signatures. I just want to make this very clear on the record as well, in that the record reflects that Chief DeAnda mentions this in the termination notice, but he makes it very clear he's not basing a termination upon this suspicion that there may have been a forging of the records. The termination was based upon everything else. And one other clarification I also want to make is there was a suggestion that Mr. Anderson had authority to construct all of these unauthorized and unpermitted structures on the K-9 yard, and that, again, Chief DeAnda trumped up the violations. The only evidence that's cited to you in the record is a 2013 memo from Mr. Anderson to former Chief Farrar, in which Mr. Anderson identifies some structures that he would like to put on the K-9 yard, scent walls, tire walls. He never identifies the structures that he ultimately represented he was authorized to oversee and build in the yard. Telephone poles, stadium lighting, six-foot-deep holes, two vehicles. There is no documentation, contrary to what Mr. Anderson said, that authorizes or even suggests that he ever mentioned these significant unauthorized and unpermitted structures to former Chief Farrar, to Chief DeAnda, or to anybody else in the command staff. And that was also part of the basis for his termination. So the reasons for his termination squarely meet the fifth prong of the Aang test, which dictates that if there was going to be a termination, even absent his speech, then summary judgment is proper. And in this case, summary judgment certainly was proper in light of all the evidence, unless the court has any questions. Thank you. It's hard to do anything in 19 seconds, so let's put a minute back on the clock. How about 15 minutes and 19 seconds? Here's how unimportant the initials, the forging of the initials were that Mr. Myerhoff said. Perhaps most troubling is the fact that the investigation confirmed that the WF initials on the memorandum were not written by the chief, but rather appeared to have been forged. They confirmed that it was not his writing. So you just have a continuation downplaying the importance of these alleged dishonesty findings. Have other officers done anything similar and not been discharged? Done anything similar? Been dishonest and not discharged? Not as much as just any one of the things that your client did. Well, you have, for instance, the Facebook posts. The other officer that was involved was not discharged. And the Facebook investigation said, termination, just for the Facebook posts that were two years old. That was not a cascading event, by the way. That was a lieutenant who said, I remember some Facebook posts and went and looked for them, even though they were two years old. Speculation over the speech. You don't have to buy, and this is the point, the end is the explanation. That was the end of that. He says, I was very embarrassed during this conversation with the mayor. We have a deal. There's not going to be political speech coming from the department. And if any embarrassment, discredit, or misconduct was brought about in the department, I'm going to hold personnel accountable. This was a big deal. Thank you.
judges: Parker, Farris, McKeown